# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No**.**

FELICIA MARTI, derivatively on behalf of
QUANTUM CORPORATION,

      Plaintiff,

v.

JAMES J. LERNER, KENNETH P.
GIANELLA, LAURA NASH, JOHN
FICHTHORN, DONALD J. JAWORSKI,
HUGUES MEYRATH, JOHN R. TRACY, and
EMILY WHITE,

      Defendants,

-and-

QUANTUM CORPORATION,

      Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

---

Plaintiff Felicia Marti ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Quantum Corporation ("Quantum" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants James J. Lerner ("Lerner"), Kenneth P. Gianella ("Gianella"), Laura Nash ("Nash"), John Fichthorn ("Fichthorn"), Donald J. Jaworski ("Jaworski"), Hugues Meyrath ("Meyrath"), John R. Tracy ("Tracy"), and Emily White ("White") (collectively, the "Individual Defendants," and together with Quantum, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Quantum, unjust enrichment, abuse

1

of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Lerner, Gianella, and Nash for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Quantum, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Quantum's directors and officers from November 15, 2024 to August 18, 2025, inclusive (the "Relevant Period").

2.      Quantum is a Delaware corporation headquartered in Centennial, Colorado that purports to provide software solutions that allow its customers to store, manage, archive, and protect video and unstructured data throughout the data life cycle. Quantum represents that its platforms enable customers to "drive new opportunities, explore new paths, or accelerate the next groundbreaking discovery."

3.      During the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements pertaining to the Company's accounting practices.

4.      For example, on November 14, 2024, Quantum filed its Form 10-Q for the second quarter of fiscal 2024 with the SEC (the "2Q 2024 Form 10-Q"). The 2Q 2024 Form 10-Q represented to investors, *inter alia*, that the financial statements contained in the 2Q 2024 Form 10-Q fairly represented the financial condition of the Company and followed U.S. Generally Accepted Accounting Principles ("GAAP").

5.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) as a result of the Company violating GAAP, Quantum had improperly recognized revenue for the fiscal year ended March 31, 2025; and (ii) as a result, Quantum's financial statements for the third quarter of fiscal 2024 were unreliable and required a restatement. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

6.      The truth began to emerge on June 30, 2025 when Quantum filed a Notification of Late Filing on Form 12b-25 with the SEC (the "June 30 Form 12b-25"), which announced that Quantum had delayed the filing of its Annual Report on Form 10-K due to the Company's ongoing review of its revenue recognition accounting practices.

7.      On this news, the price of the Company's stock fell $1.00 per share, or approximately 10%, from a closing price of $9.97 per share on June 30, 2025, to close at $8.97 per share on July 1, 2025.

8.      The truth fully emerged on August 18, 2025 when the Company filed a Form 8-K with the SEC (the "August 18 Form 8-K") announcing that Quantum's Chief Financial Officer ("CFO"), Lewis W. Moorhead, would be resigning from his role, after being appointed less than

five months prior.

9.      On this news, the price of the Company's stock fell $0.61 per share, or approximately 8.2%, from a closing price of $7.44 per share on August 18, 2025, to close at $6.83 per share on August 19, 2025.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

12.     In light of the Individual Defendants' misconduct, which has subjected Quantum, its former President and Chief Executive Officer ("CEO"), its former CFO, and its Chief Accounting Officer ("CAO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action and of the Company's, the former CEO's, the CAO's, and the former CFO's liability in the Securities Class Action, of their being beholden to each other, their longstanding business and personal relationships with each

other, and their not being disinterested and/or independent directors, a majority of Quantum's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. §1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Colorado or who had minimum contacts with this District to justify the exercise of jurisdiction over them. Venue is proper in this district pursuant to 28 U.S.C. §§1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial

compensation in this District by engaging in the numerous activities that had an effect in this District.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

20.     Plaintiff is a current shareholder of Quantum common stock. Plaintiff has continuously held Quantum common stock since first purchasing the stock on February 8, 2018.

21.     Plaintiff is a citizen of Costa Rica.

**Nominal Defendant Quantum**

22.     Quantum is a Delaware corporation with its principal executive offices at 10770 E. Briarwood Avenue, Centennial, Colorado 80112. Quantum's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "QMCO." Nominal Defendant Quantum is a citizen of the states of Colorado and Delaware.

**Defendant Lerner**

23.     Defendant Lerner served as the Company's President, CEO, and as a Company director from July 2018 until he resigned on June 18, 2025.

24.     The Schedule 14A the Company filed with the SEC on June 18, 2024 (the "2024 Proxy Statement") stated the following about Defendant Lerner:

> Mr. Lerner has served as our President and Chief Executive Officer since July 2018. He was appointed to the Board at that time and named Chairman in August 2018.
>
> Some of Quantum's key accomplishments during Mr. Lerner's tenure include:
>
> ● Furthering its transition from one-time hardware sales to a recurring software

6

revenue model;

● Launching more than 20 new products, including Quantum Myriad$^{TM}$ , an all-flash file and object storage platform, and acquiring additional software and hardware features, products, and business that introduced incremental performance capabilities; and

● Driving the Company's opportunities and position in the AI market.

Mr. Lerner previously served in senior leadership positions at Pivot3 Inc., a smart infrastructure solutions company. He held the roles of Vice President and Chief Operating Officer from March 2017 to June 2018 and Chief Revenue Officer from November 2016 to March 2017. Prior to Pivot3, from March 2014 to August 2015, he served as President of Cloud Systems and Solutions at Seagate Technology Public Limited Company, a publicly-traded data storage company.

Before working at Seagate, Mr. Lerner served in various executive roles at Cisco Systems, Inc., a publicly-traded networking hardware and software manufacturing company, including as Senior Vice President and General Manager of the Cloud & Systems Management Technology Group. Prior to beginning his career as a technology company executive, he was a Senior Consultant at Andersen Consulting, a financial advisory and consulting firm.

From 2011 to 2022, Mr. Lerner served on the Board of Trustees (including serving as Chair) of Astia, a global not-for-profit organization built on a community of men and women dedicated to the success of women-led, high-growth ventures.

Mr. Lerner earned a Bachelor of Arts in Quantitative Economics and Decision Sciences from the University of California, San Diego.

We believe Mr. Lerner's extensive history in our industry and unstructured data, his deep understanding of our business given his role as our Chief Executive Officer, and executive-level experience at several publicly-traded companies qualifies him to serve on our Board.

Mr. Lerner does not sit on any Board committees.

25.     Upon information and belief, Defendant Lerner is a citizen of California.

**Defendant Gianella**

26.     Defendant Gianella served as the Company's CFO from January 2023 until April 3, 2025.

27.     Upon information and belief, Defendant Gianella is a citizen of California.

**Defendant Nash**

28.    Defendant Nash has served as the Company's Principal Financial Officer since August 2025. Defendant Nash has also served as the Company's CAO since June 2023.

29.    The Company's website states the following about Defendant Nash[1]:

Laura Nash is Quantum's Chief Accounting Officer and previously served as Quantum's Controller since June 2019. Prior to that, Laura held various positions in Audit and Financial Accounting Advisory Services at Ernst & Young in both the US and the UK. Laura holds a Bachelor of Laws from the University of Aberdeen and a Certificate in Accounting from University of Washington - Michael G. Foster School of Business. She is a member of the Institute of Chartered Accountants of Scotland.

30.    Upon information and belief, Defendant Nash is a citizen of Washington.

**Defendant Fichthorn**

31.    Defendant Fichthorn has served as a Company director since April 2025. He also serves as the Chair of the Corporate Governance and Nominating Committee.

32.    The Schedule 14A the Company filed with the SEC on October 31, 2025 (the "October 2025 Proxy Statement") stated the following about Defendant Fichthorn:

Mr. Fichthorn has served as the Founder and Managing Partner of Dialectic Capital Management, since the re-launching of Dialectic in May 2020. He is also the Founder and Managing Partner of Medtex Ventures, a medical device venture capital firm he founded in 2020.

Prior to that, Mr. Fichthorn was the Head of Alternative Investments at B. Riley Capital Management, LLC, an investment advisor and wholly-owned subsidiary of B. Riley Financial, Inc, from April 2017 until May 2020. Before that, Mr. Fichthorn co-founded Dialectic Capital Management, where he was an equities portfolio manager and analyst from 2003 to 2017.

Mr. Fichthorn has served on the boards of directors at:

• Benefytt, formerly called Health Insurance Innovations, Inc., a publicly traded health insurance and technology platform company, from December 2017 to August 2020.

---

[1] https://www.quantum.com/en/company/quantum-leadership/

• TheMaven (now The Arena Group), a publicly traded online media company, from September 2018 to October 2021.

• Multiple private companies that are portfolio companies of Dialectic Capital and Medtex Ventures.

Mr. Fichthorn earned a Bachelor of Arts degree in Astronomy from the University of North Carolina at Chapel Hill.

Mr. Fichthorn has significant experience in accounting and financial matters, experience serving on other public and private company boards, and brings shareholder perspective to our Board. We believe he brings strength to our Board as a result of his experience managing investment firms and being a shareholder activist.

33.    Upon information and belief, Defendant Fichthorn is a citizen of Connecticut.

**Defendant Jaworski**

34.    Defendant Jaworski has served as a Company director since November 2022. He also serves as the Chairman of the Board, Chair of the Leadership and Compensation Committee, and as a member of the Audit Committee and Special Committee.

35.    The October 2025 Proxy Statement stated the following about Defendant Jaworski:

Mr. Jaworski is President and Chief Operating Officer of Lacuna Technologies, Inc., a leader in software that helps municipalities to operationalize digital infrastructure and manage transportation, since March 2021. Mr. Jaworski leads execution and is focused on delivering value to Lacuna's customers. Prior to joining Lacuna, from January 2015 to March 2020, he was CEO of SwiftStack, Inc., an open-source cloud data management company focused on large scale data applications, which was acquired by NVIDIA Corporation, a publicly-traded technology company, in March 2020.

Mr. Jaworski previously served as:

• Senior Vice President and General Manager of the core platform business at NetApp, Inc. from August 2010 through January 2012, where the team focused on the transition to scale-out systems.

• Senior Vice President Product at Brocade Communications Systems, Inc.

• General Manager of the Enterprise Security business unit at Nokia Corporation.

9

In addition, Mr. Jaworski's early career included management positions at Sun Microsystems, Inc. and Amdahl Corporation. He has been an advisor and board member for a number of early-stage companies.

Mr. Jaworski received a B.S. in Computer Science from Bowling Green State University and an MBA from Santa Clara University.

We believe Mr. Jaworski brings strength to our Board through his broad and deep technology and product development and marketing experience.

36.     Upon information and belief, Defendant Jaworski is a citizen of California.

**Defendant Meyrath**

37.     Defendant Meyrath has served as a Company director since November 2022 and as

the Company's CEO and President since June 2025.

38.     The October 2025 Proxy Statement stated the following about Defendant Meyrath:

Mr. Meyrath has developed an extensive background in various leadership roles at global technology companies, most notably in the networking and data storage segments. Before joining Quantum, from January 2017 to December 2021, he served as Chief Product Officer of ServiceChannel Holdings Inc., a provider of SaaS-based multi-site solutions, which was acquired by Fortive Corporation, a publicly-traded provider of connected workflow solutions, in 2021.

From January 2014 to January 2017, Mr. Meyrath was Vice President at Dell Technologies Capital, a venture capital arm of Dell Technologies that invests in enterprise and cloud infrastructure, where he was responsible for driving venture funding, mergers and acquisitions, and other advisory roles for a diverse set of portfolio companies. He also held the role of Vice President of Product Management and Business Development for Dell EMC's Backup and Recovery Services, which offers data protection and business continuity products.

Mr. Meyrath's experience also includes executive roles at:

• Juniper Networks, Inc.

• Brocade Communications Systems, Inc.

• Strategic Business Systems, Inc.

He was also previously a Quantum employee from January 2002 to September 2003.

10

We believe Mr. Meyrath's extensive work in product portfolio and technology development, and in particular his experience with data storage technologies, as well as his deep understanding of our business given his role as our Chief Executive Officer, provides valuable experience and perspective to our Board.

39.    Upon information and belief, Defendant Meyrath is a citizen of Florida.

**Defendant Tracy**

40.    Defendant Tracy has served as a Company director since June 2024. He also serves as the Chair of the Audit Committee and the Special Committee and as a member of the Leadership and Compensation Committee and the Corporate Governance and Nominating Committee.

41.    The October 2025 Proxy Statement stated the following about Defendant Tracy:

Mr. Tracy has an extensive background in public company financial planning and operations. Most recently, he served as Executive Vice President and Chief Financial Officer at Verifone Systems, Inc., a payment system company, from February 2019 until April 2024. Prior to that, from November 2017 to November 2019, Mr. Tracy served as Senior Director at Pine Hill Group (now CFGI), an accounting and transaction advisory firm.

From July 2015 to October 2016, Mr. Tracy held the position of Senior Vice President Finance for TiVo Inc. (formerly Rovi), a streaming entertainment content delivery service. Prior to that, he was Vice President Finance and Chief Financial Officer for TE Connectivity Inc., a publicly-traded electronics connector and sensor manufacturer, from June 2013 to June 2015. He also served as Vice President and Corporate Controller at ConvaTec, a publicly-traded medical products and technology company, from October 2012 to June 2013.

Mr. Tracy also held various senior finance roles at Motorola Inc. and its subsidiaries. He received a Bachelor of Science degree in Accounting from Rider University and a Masters of Science in Taxation from Fairleigh Dickinson University.

We believe Mr. Tracy's financial expertise, including his experience as a chief financial officer, makes him a valuable member of our Board.

42.    Upon information and belief, Defendant Tracy is a citizen of New Jersey.

**Defendant White**

43.    Defendant White has served as a Company director since September 2021. She also

serves as a member of the Audit Committee, Leadership and Compensation Committee, Corporate Governance and Nominating Committee, and Special Committee.

44.    The October 2025 Proxy Statement stated the following about Defendant White:

Ms. White held the position of Vice President, Enterprise Data and Analytics at Cisco Systems, a publicly-traded networking hardware and software manufacturing company from July 2024 to July 2025.

Prior to Cisco, she served as Vice President of Enterprise Data and Analytics at NIKE, Inc., a public company that manufactures and sells athletic apparel, beginning in April 2020. Prior to NIKE, from February 2017 to April 2020, Ms. White served as Vice President of Enterprise Data Engineering at Synchrony Financial, a publicly-traded consumer financial services company.

Ms. White previously held multiple positions at General Electric entities. From November 2013 to June 2015, she served as Data Science Director and Global Commercial IT Director at General Electric Healthcare, a company that manufactures and distributes medical imaging modalities. From May 2007 to October 2013, she was Global Enterprise Resource Director and Senior Global Business Intelligence Program Manager for General Electric Transportation, a company that manufactures equipment for energy generation industries.

Ms. White's education includes a:

• Bachelor of Science degree in Accounting and Finance from Shengyang Polytechnic University;

• Master of Business Administration degree from Huron University;

• Master of Applied Mathematics degree in Computer Science at the University of Central Oklahoma; and

• Certificate in Health Economics & Outcomes Research from the University of Washington.

We believe Ms. White's extensive senior management experience, particularly in data science and analytics, brings valuable perspective to our Board and to the oversight of these functions within Quantum.

45.    Upon information and belief, Defendant White is a citizen of California.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

46.    By reason of their positions as officers, directors, and/or fiduciaries of Quantum

and because of their ability to control the business and corporate affairs of Quantum, the Individual Defendants owed Quantum and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Quantum in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Quantum and its shareholders so as to benefit all shareholders equally.

47.    Each director and officer of the Company owes to Quantum and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Quantum and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Quantum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

49.    To discharge their duties, the officers and directors of Quantum were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Quantum, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the

Quantum. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Quantum's Board at all relevant times.

51.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC and all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

52.     To discharge their duties, the officers and directors of Quantum were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Quantum were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to Quantum's own Code of Conduct ("Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Quantum conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

       (d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Quantum and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Quantum's operations would comply with all applicable laws and Quantum's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.    Each of the Individual Defendants further owed to Quantum and the shareholders the duty of loyalty requiring that each favor Quantum's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

54.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Quantum and were at all times acting within the course and scope of such agency.

55.     Because of their advisory, executive, managerial, and directorial positions with Quantum, each of the Individual Defendants had access to adverse, non-public information about the Company.

56.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Quantum.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement waste of corporate assets, abuse of control, and violations of the Exchange Act.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Quantum,

was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Quantum and was at all times acting within the course and scope of such agency.

<u>**QUANTUM'S CODE OF CONDUCT**</u>

62.     The Company maintains a Code of Conduct which it refers to as "OnTraQ." The Code of Conduct applies to "all employees, officers, directors, contractors, consultants, and agents (the Quantum Team)."

63.     In a section titled "Transparency," the Code of Conduct states:

Only the Board of Directors or its committees may grant amendments or waivers regarding the application of OnTraQ to a Quantum director or executive officer. If approved, those changes must be promptly disclosed to Quantum shareholders in accordance with applicable reporting requirements

64.     In a section titled "We generation revenue responsibly," the Code of Conduct states the following:

Business arrangements that significantly differ from our standard terms can create revenue recognition, cash collection, and recordkeeping challenges. The following practices are strictly prohibited, and anyone aware of or involved with them may be subject to disciplinary action, up to and including termination:

1. Channel stuffing, or leveraging distribution partners to stock more inventory than

they actually want or need;

2. Entering into deal-specific sales to distribution partners before the expected end user purchase order is created;

3. Offering purchase price discounts, payment term extensions, or inventory stocking arrangements or returns that have not been approved by the accounting team in advance; or

4. Engaging in a side deal, which involves accepting terms and conditions that have not been approved by the legal and accounting departments.

65.    In a section titled "We follow internal controls," the Code of Conduct states:

We adhere to Quantum's finance and internal control structure, including SOX controls and our revenue recognition policy.  If you are asked to represent that we are in compliance with those requirements, do so honestly and with full disclosure of any situations that might conflict with internal control procedures.

Use the OnTraQ Helpline, Quantum's confidential and anonymous reporting service powered by Convercent, to promptly report any of the following situations as soon as you become aware of them:

1. The Company's failure to comply with accounting procedures mandated by applicable securities laws, the SEC, or other applicable rules, regulations, or official guidance;

2. Requests made to you, or anyone else you are aware of, to discharge assigned duties in a manner that fails to comply with any such rules, regulations, or guidance;

3. Requests to improperly report revenue or falsify any other records related to compliance with the SEC's rules, regulations or guidance; or

4. Anyone falsifying records at the Company.

66.    In a section titled "We represent Quantum well," the Code of Conduct states:

We obtain approval from the marketing and legal teams before speaking publicly on behalf of Quantum. When not speaking on behalf of Quantum, we are clear that the views expressed are our own and don't represent Quantum's corporate opinion.

Quantum's public communication processes and securities filings promote full, fair, accurate, timely, and understandable disclosure. Special rules govern communications between Quantum, investment analysts and advisers, and shareholders. Only Quantum-authorized spokespeople should conduct official communications.

67.    In a section titled "We trade stock responsibly," the Code of Conduct states:

Our ability to trade Quantum stock is limited when we have material nonpublic information, including unannounced information about financial results and strategic business plans. That trading limitation extends to others with whom we have close relationships, as well as the securities of our business partners if we have access to important information they have not yet made public.

68.    In a section titled "We maintain accurate records," the Code of Conduct states:

The emails and documents we create form a record of Quantum's business interests and transactions, so it's important we maintain them in accordance with the Company's Records Retention Program. In addition, full compliance with applicable litigation hold requirements is expected from all members of the Quantum Team.

69.    In a section titled "We encourage responsible reporting," the Code of Conduct states:

Speaking up should be celebrated, so we encourage reporting concerns by vigorously enforcing our policy prohibiting retaliatory actions against anyone who raises an ethics or compliance concern in good faith.

70.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## QUANTUM'S AUDIT COMMITTEE CHARTER

71.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is to, *inter alia*:

1. Assist the Board in its oversight of:

a. the Company's financial statement integrity;

b. the Company's internal accounting and financial reporting processes and controls adequacy;

c. the Company's compliance with legal and regulatory requirements;

d. the Company's policies and processes for risk assessment and management;

e. the qualification, independence, and performance of the Company's independent auditors; and

f. the Company's internal audit function performance; and

2. Prepare the Audit Committee report required by Securities and Exchange Commission (SEC) rules.

72.    In a section titled "Duties and Responsibilities," under the subheading "Oversight of the Company Financial Statements and Internal Controls," the Audit Committee Charter states:

1. Review and discuss the Company's annual audited financial statements and quarterly financial statements with management, the internal auditor, and the independent auditors, including the Company's disclosures under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's reports filed with the SEC.

2. As appropriate, the Committee shall review with management and the independent auditors, in separate meetings if the Committee deems it necessary: (i) any analysis or other written communications prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effect of alternative GAAP methods on the financial statements; (ii) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and (iii) the effect of regulatory and accounting initiatives or actions, as well as off-balance sheet structures, on the Company's financial statements.

3. Review and discuss with management and the independent auditors the Company's earnings press releases, and review and approve with management (including the CEO and CFO) the nature of any additional financial information and financial guidance to be provided publicly, to analysts and/or to ratings agencies to ensure that the proposed guidance has a reasonable basis and that all

20

material risks and contingencies are properly disclosed.

4. Review and discuss with management and the independent auditors the matters required to be discussed by various Statements on Auditing Standards relating to the conduct of the audit, other significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, and any other matters communicated to the Committee by the independent auditors.

5. Based on its review and discussions with management and the independent auditors, recommend to the Board whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K.

6. Review with the independent auditors any difficulties encountered in the course of their audit, including any restrictions on the scope of their activities or on access to requested information, any significant disagreements with management and management's response.

7. Review with the independent auditors any management letter they provide and the Company's responses to that letter.

8. Review with the internal auditors the Company's control environment, and identify and discuss with the internal auditors their evaluation of the Company's system of processes and controls, including and risk areas that require attention.

9. Review and discuss with management, including the Disclosure Committee, as provided in further detail below, and the independent auditors the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures. The review and discussion scope shall include any significant deficiencies, material weaknesses and significant changes in internal control over financial reporting management reports to the Committee, any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting, and any special audit steps adopted in light of material control deficiencies.

10. Oversee the work of the Disclosure Committee. The Audit Committee shall meet separately with, and review reports from, management and the Disclosure Committee (including the Chair of the Disclosure Committee) at least once each quarter, and more frequently if necessary, to effectively supervise the Company's disclosure function and specific disclosure issues of particular importance.

11. Review with the Disclosure Committee or other management any financial statements, including, but not limited to, any Form 10-Q, Form 10-K, Form 8-K (reporting earnings), or annual proxy statement issued by the Company, to ensure sufficient material risk disclosures.

12. Review with the Board any issues that arise with respect to the quality or

integrity of the Company's financial statements or compliance with legal or regulatory requirements, and the performance and independence of the Company's independent auditors.

73.    In the same section, under the subheading "With Respect to Other Matters," the

Audit Committee Charter states, in relevant part:

> 1. Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for periodic reports filed with the SEC about: (i) any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein, (ii) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting, or (iii) the effectiveness of the Company's disclosure controls and procedures.

> \*\*\*

> 4. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's policies with respect to risk assessment and risk management.

> 5. Periodically evaluate the Company's risk management process and system in light of the nature of the material risks the Company faces and the adequacy of the Company's policies and procedures designed to address risk, and recommend to the Board any changes the Committee deems appropriate.

> \*\*\*

> 7. Develop, with the assistance of the Company's Chief Compliance Officer and other members of senior management, and recommend to the Board a code of conduct applicable to Board members, officers and employees of the Company. The code shall comply with applicable securities laws and regulations and stock market rules, and from time to time or as necessary recommend to the Board any revisions to such code that the Committee deems appropriate or to ensure compliance with such laws, regulations and rules.

> 8. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by the Company's employees of concerns regarding accounting or auditing matters.

> \*\*\*

> 11. Review any proposed waiver of the code of conduct as it applies to senior financial and other executive officers and recommend to the Board the disposition of any proposed waiver.

12. Make regular reports to the Board on the activities of the Committee.

74.    The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

75.    Quantum purports to provide software solutions that store, manage, archive, and protect its customers' videos and unstructured data throughout the data life cycle. When a customer uses Quantum's services, they can purportedly extract valuable information from their data, purportedly allowing them to gain an advantage over their competitors.

## FALSE AND MISLEADING STATEMENTS

### *November 14, 2024 Form 10-Q*

76.    On November 14, 2024, the Company filed the 2Q 2024 Form 10-Q with the SEC, which reported Quantum's financial results for the second quarter of the 2024 fiscal year. The 2Q 2024 Form 10-Q was signed by Defendants Lerner and Gianella and also included certifications signed by Defendants Lerner and Gianella, made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the 2Q 2024 Form 10-Q and that the 2Q 2024 Form 10-Q

"does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

77.    With respect to the purported accuracy of Quantum's financial statements, the 2Q 2024 Form 10-Q stated:

> Notwithstanding the identified material weaknesses, management, including our chief executive officer and chief financial officer have determined, that the condensed consolidated financial statements included in this Form 10-Q fairly represent in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, for the periods presented in accordance with U.S. generally accepted accounting principles.

78.    The statements in ¶¶76-77 were materially false and misleading and failed to disclose, *inter alia*, that as a result of Quantum's improper revenue recognition practices, the 2Q 2024 Form 10-Q did not fairly represent in all material respects the financial condition, results of operations, and cashflows of Quantum.

### *February 12, 2025 Form 10-Q*

79.    On February 12, 2025, Quantum filed its Form 10-Q for the third quarter of fiscal 2024 with the SEC (the "3Q 2024 Form 10-Q"), which was signed by Defendants Lerner and Gianella. The 3Q 2024 Form 10-Q also included SOX certifications by Defendants Lerner and Gianella attesting to the accuracy of the 3Q 2024 Form 10-Q and that the 3Q 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

80.    The 3Q 2024 Form 10-Q discussed the purported accuracy of the Company's financial statements, stating:

> Notwithstanding the identified material weaknesses, management, including our

chief executive officer and chief financial officer have determined, that the condensed consolidated financial statements included in this Form 10-Q fairly represent in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, for the periods presented in accordance with U.S. generally accepted accounting principles.

81. The statements in ¶¶79-80 were materially false and misleading and failed to disclose, *inter alia*, that as a result of Quantum's improper revenue recognition practices, the 3Q 2024 Form 10-Q did not fairly represent in all material respects the financial condition, results of operations, and cashflows of Quantum.

82. The 3Q 2024 Form 10-Q further discussed the Company's accounting practices when preparing its financial statements, stating:

> The accompanying unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading.

83. The statements in ¶82 were materially false and misleading and failed to disclose, *inter alia*, that the Company had violated GAAP due to its improper revenue recognition practices in the third quarter of 2024.

84. The statements contained in ¶¶77, 80, and 82 were also materially false and misleading and failed to disclose, *inter alia*, that: (i) as a result of the Company violating GAAP, Quantum had improperly recognized revenue for the fiscal year ended on March 31, 2025; and (ii) as a result, Quantum's financial statements for the third quarter of fiscal 2024 were unreliable and required a restatement. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***March 27, 2025 Proxy Statement***

85.    On March 27, 2025, Quantum filed a proxy statement on Schedule 14A with the SEC (the "March 2025 Proxy Statement"). Defendants Lerner, Jaworski, Meyrath, Tracy, and White solicited the March 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

86.    The March 2025 Proxy Statement called for shareholders to vote on, *inter alia:* (1) the approval of the issuance of up to $200,000,000 of Quantum's common stock pursuant to a Standby Equity Purchase Agreement dated January 25, 2025 and related change of control for purposes of complying with Nasdaq listing rule 5635; (2) the ratification of the appointment of Grant Thornton LLP as Quantum's independent registered public account firm for the fiscal year ending March 31, 2026; and (3) the approval of the adjournment of a Special Meeting to a later date, if necessary or appropriate.

87.    The March 2025 Proxy Statement was materially false and misleading and failed to disclose, *inter alia*, that: (i) as a result of the Company violating GAAP, Quantum had improperly recognized revenue for the fiscal year ended March 31, 2025; and (ii) as a result, Quantum's  financial statements for the third quarter of fiscal 2024 were unreliable and required a restatement. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

88.    As a result of Defendants Lerner, Jaworski, Meyrath, Tracy, and White failing to disclose that Quantum's improper revenue recognition practices caused the Company's financial statements to be misleading, Company shareholders voted, *inter alia*, for: (1) the approval of the issuance of up to $200,000,000 of Quantum's common stock pursuant to a Standby Equity Purchase Agreement dated January 25, 2025 and related change of control for purposes of complying with Nasdaq listing rule 5635; (2) the ratification of the appointment of Grant Thornton

LLP as Quantum's independent registered public account firm for the fiscal year ending March 31, 2026; and (3) the approval of the adjournment of a Special Meeting to a later date, if necessary or appropriate.

## THE TRUTH BEGINS TO EMERGE

89.     The truth began to emerge on June 30, 2025 when the Company filed the June 30 Form 12b-25 with the SEC announcing that it would be postponing the filing of its Annual Report on Form 10-K because the Company was in the midst of reviewing its revenue recognition accounting practices. Specifically, the June 30 Form 12b-25 stated, in relevant part:

> Quantum Corporation (the "Company") has determined that it is unable to file its Annual Report on Form 10-K (the "Form 10-K") for the fiscal year ended March 31, 2025 ("Fiscal 2025") by June 30, 2025, the original due date for such filing, without unreasonable effort or expense due to the circumstances described below.

> The Company is reviewing its accounting related to certain revenue contracts as well as the application of standalone selling price under applicable accounting standards. The results of the review will need to be reflected in the Company's financial statements for Fiscal 2025 in the Form 10-K. The Company does not expect the current review will affect the Company's financial statements for any fiscal periods prior to Fiscal 2025.

90.     On this news, the price of the Company's stock fell $1.00 per share, or approximately 10%, from a closing price of $9.97 per share on June 30, 2025, to close at $8.97 per share on July 1, 2025.

91.     The truth continued to emerge on August 8, 2025 when the Company filed a Form 8-K with the SEC (the "August 8 Form 8-K") announcing that Quantum's financial results for the third quarter of fiscal 2024 could no longer be relied upon and would be restated to reflect a new decrease of approximately $3.9 million in revenue. The August 8 Form 8-K also disclosed that there were material weaknesses in the Company's internal control over financial reporting and disclosure controls as of December 31, 2024 and March 31, 2025. Specifically, the August 8 Form

8-K stated, in relevant part:

On August 8, 2025, the Board of Directors (the "Board") of Quantum Corporation (the "Company") concluded that the Company's previously-issued unaudited interim condensed consolidated financial statements for the fiscal third quarter ended December 31, 2024 contained in its Quarterly Report on Form 10-Q (the "Non-Reliance Period"), as well as its disclosures related to such financial statements, including any reports, earnings releases, and investor presentations, and related communications issued by or on behalf of the Company with respect to the Non-Reliance Period, including management's assessment of internal control over financial reporting and disclosure controls and procedures, should no longer be relied upon. The determination by the Board was made upon the recommendation of the Audit Committee (the "Audit Committee") of the Board and after consultation with the Company's management team.

In June 2025, the Company identified certain service and subscription revenue inconsistencies during the Non-Reliance Period, which is deferred under Accounting Standards Codification Topic 606 ("Topic 606") and recognized ratably over the term of the contract. The Company's management reviewed and updated the periods over which revenue was being recognized to ensure consistent application for all service contracts invoiced in the fiscal year ended March 31, 2025 and the results have been applied to revenue. The Company's management determined that no contracts entered into prior to fiscal year ended March 31, 2025 were impacted. The Company also determined that the standalone selling price that is used to allocate revenue under Topic 606 needed to be updated for the fiscal year ended March 31, 2025 resulting in an adjustment to revenue. As a result of these errors, the Company will restate the financial statements for the Non-Reliance Period (the "Restatement"). Subject to completion of its financial close procedures, the Company currently expects the Restatement will result in a decrease of approximately $3.9 million in revenue and a similar decrease in net loss from operations in the Non-Reliance Period.

In connection with the Restatement, the Audit Committee concluded, with concurrence of management, that there were deficiencies in the Company's internal control over financial reporting and the Company's disclosure controls and procedures that constituted material weaknesses as of December 31, 2024 and March 31, 2025. The Company expects to report material weaknesses related to the Company's revenue recognition. As a result of these expected material weaknesses, the Company believes that it did not maintain effective entity-level controls within the control environment to prevent or detect material misstatements. Additional deficiencies or material weaknesses in the Company's internal controls may be identified during its review. The Company's full assessment of the effectiveness of its internal control over financial reporting will be described in more detail in the Annual Report on Form 10-K for the year ended March 31, 2025 (the "2025 10-K").

92.     On this news, the price of the Company's stock fell $0.14 per share, or approximately 1.8%, from a closing price of $7.80 per share on August 8, 2025, to close at $7.66 per share on August 11, 2025.

## THE TRUTH EMERGES

93.     The truth fully emerged on August 18, 2025 when the Company issued the August 18 Form 8-K, announcing that Lewis W. Moorhead would be resigning from his role as CFO after serving in the position for less than five months.

94.     On this news, the price of the Company's stock fell $0.61 per share, or approximately 8.2%, from a closing price of $7.44 per share on August 18, 2025, to close at $6.83 per share on August 19, 2025.

## DAMAGES TO QUANTUM

95.     As a direct and proximate result of the Individual Defendants' conduct, Quantum has lost and expended, and will continue to lose and expend, many millions of dollars.

96.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

97.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts

associated with the Company's violations.

99.     Such expenditures will also include costs incurred as a result of the Company needing to restate its financial results due to the Individual Defendants' misconduct as set forth herein.

100.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

101.     As a direct and proximate result of the Individual Defendants' conduct, Quantum has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

102.     Plaintiff brings this action derivatively and for the benefit of Quantum to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Quantum, waste of corporate assets, unjust enrichment, gross mismanagement, abuse of control, and violations of the Exchange Act.

103.     Quantum is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

104.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Quantum. Plaintiff will adequately and fairly represent the interests of Quantum in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

105. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

106. A pre-suit demand on the Board of Quantum is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Fichthorn, Jaworski, Meyrath, Tracy, and White (the "Director-Defendants"), and non-parties James C. Clancy and Tony J. Blevins (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

107. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

108. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

109. Additional reasons that demand on Defendant Fichthorn is futile follow. Defendant Fichthorn has served as a Company director since April 2025. He also serves as the Chair of the

Corporate Governance and Nominating Committee. Defendant Fichthorn has received and continues to receive handsome compensation for his role as director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Fichthorn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Jaworski is futile follow. Defendant Jaworski has served as a Company director since November 2022. He also serves as the Chairman of the Board, Chair of the Leadership and Compensation Committee, and as a member of the Audit Committee and Special Committee. Defendant Jaworski has received and continues to receive handsome compensation for his role as director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Jaworski solicited the March 2025 Proxy Statement, which omitted disclosures regarding the Company's revenue recognition practices, and resulted in, *inter alia,* the approval of the issuance of up to $200,000,000 of Quantum common stock pursuant to a Standby Equity Purchase Agreement. For these reasons, Defendant Jaworski breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Meyrath is futile follow. Defendant

Meyrath has served as a Company director since November 2022 and as the Company's CEO and President since June 2025. The Company provides Defendant Meyrath with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Meyrath solicited the March 2025 Proxy Statement, which omitted disclosures regarding the Company's revenue recognition practices, and resulted in, *inter alia*, the approval of the issuance of up to $200,000,000 of Quantum common stock pursuant to a Standby Equity Purchase Agreement. For these reasons, too, Defendant Meyrath breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Tracy is futile follow. Defendant Tracy has served as a Company director since June 2024. He also serves as the Chair of the Audit Committee and the Special Committee and as a member of the Corporate Governance and Nominating Committee and the Leadership and Compensation Committee. Defendant Tracy has received and continues to receive handsome compensation for his role as director. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Tracy solicited the March 2025 Proxy Statement, which omitted disclosures regarding the Company's revenue recognition practices, and

resulted in, *inter alia*, the approval of the issuance of up to $200,000,000 of Quantum common stock pursuant to a Standby Equity Purchase Agreement. For these reasons, Defendant Tracy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant White is futile follow. Defendant White has served as a Company director since September 2021. She also serves as a member of the Audit Committee, Corporate Governance and Nominating Committee, Leadership and Compensation Committee, and the Special Committee. Defendant White has received and continues to receive handsome compensation for her role as director. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant White solicited the March 2025 Proxy Statement, which omitted disclosures regarding the Company's revenue recognition practices, and resulted in, *inter alia,* the approval of the issuance of up to $200,000,000 of Quantum common stock pursuant to a Standby Equity Purchase Agreement. For these reasons, Defendant White breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

114.    Additional reasons that demand on the Board is futile follow.

115.    Defendants White (as Chair), Jaworski, and Tracy (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and

regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

116.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

117.    Quantum has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Quantum any part of the damages Quantum suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

118.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

119.    The acts complained of herein constitute violations of fiduciary duties owed by Quantum's officers and directors, and these acts are incapable of ratification.

120.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Quantum. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Quantum, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

121.    If there is no directors' and officers' liability insurance, then the Directors will not

cause Quantum to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

122.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

123.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

124.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

125.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

126.    Under the direction and watch of Defendants Lerner, Jaworski, Meyrath, Tracy, and White, the March 2025 Proxy Statement failed to disclose, *inter alia*, that: (i) as a result of the Company violating GAAP, Quantum had improperly recognized revenue for the fiscal year ended

on March 31, 2025; and (ii) as a result, Quantum's financial statements for the third quarter of fiscal 2024 were unreliable and required a restatement . As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times

127.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the March 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the March 2025 Proxy Statement, including, but not limited to, the issuance of $200,000,000 of Quantum common stock pursuant to a Standby Equity Purchase Agreement.

128.    As a result of the material misstatements and omissions contained in the March 2025 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) approve the issuance of up to $200,000 of Quantum's common stock pursuant to a Standby Equity Purchase Agreement dated January 25, 2025 and related change of control for purposes of complying with Nasdaq listing rule 5635; (2) ratify the appointment of Grant Thornton LLP as Quantum's independent registered public account firm for the fiscal year ending March 31, 2026; and (3) approve of the adjournment of a Special Meeting to a later date.

129.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the March 2025 Proxy Statement.

130.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

131.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.    Each Individual Defendant owed to the Company the duty to exercise candor, good

faith, and loyalty in the management and administration of Quantum's business and affairs.

133.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

134.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Quantum.

135.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

136.    In further breach of their fiduciary duties owed to Quantum, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) as a result of the Company violating GAAP, Quantum had improperly recognized revenue for the fiscal year ended on March 31, 2025; and (ii) as a result, Quantum's financial statements for the third quarter of fiscal 2024 were unreliable and required a restatement. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

137.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

138.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and

omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

139.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

140.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Quantum has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Quantum, for which they are legally responsible.

145.    As a direct and proximate result of the Individual Defendants' abuse of control,

Quantum has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146. Plaintiff, on behalf of Quantum, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Unjust Enrichment**

147. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Quantum.

149. The Individual Defendants either benefitted financially from the improper conduct or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

150. Plaintiff, as a shareholder and a representative of Quantum, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

151. Plaintiff, on behalf of Quantum, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

152. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Quantum in a manner consistent with the

41

operations of a publicly held corporation.

154.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Quantum has sustained and will continue to sustain significant damages.

155.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

### SIXTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

157.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

159.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

160.    Plaintiff, on behalf of Quantum, has no adequate remedy at law.

### SEVENTH  CLAIM
**Against Defendants Lerner, Gianella, and Nash for Contribution under Sections 10(b) and 21D of the Exchange Act**

161.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.    Quantum and Defendants Lerner, Gianella, and Nash are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of

Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Lerner's, Gianella's, and Nash's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

163.    Defendants Lerner, Gianella, and Nash, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

164.    Accordingly, Defendants Lerner, Gianella, and Nash are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

165.    As such, Quantum is entitled to receive all appropriate contribution or indemnification from Defendants Lerner, Gianella, and Nash.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Quantum, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Quantum;

(c)    Determining and awarding to Quantum the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Quantum and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Quantum and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Quantum to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Quantum restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 4, 2025                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Docusign Envelope ID: 4F677BDA-511B-40D5-A0CD-75C2B5C86001

## **VERIFICATION**

I, Felicia Marti, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3rd day of November, 2025.

Felicia Marti